FBOFMIN1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MINERVA TEXTILES, LTD.,

4                   Plaintiff,

5           v.                              13 CV 8954 (VSB)

6   ABC SUPERSTORES, INC., et al,

7                   Defendants.

8   ------------------------------x
                                        New York, N.Y.
9                                       November 24, 2015
                                        11:30 a.m.
10
    Before:
11
                        HON. VERNON S. BRODERICK,
12
                                            District Judge
13
                           APPEARANCES
14
    BALLON, STOLL, BADER and NADLER
15       Attorneys for Plaintiff
    BRETT ANDREW NADLER, ESQ.
16
    MYERS TERSIGNI FELDMAN & GRAY LLP
17       Attorneys for Defendant ABC
    ANDREA TERSIGNI, ESQ.
18
    CALLAN, KOSTER, BRADY & BRENNAN
19       Attorneys for Defendant Gilbar
    STEPHEN BARRETT, ESQ.
20

21

22

23

24

25

FBOFMIN1

1              (Case called)

2              (In open court; via speakerphone)

3              THE COURT:  This is Judge Broderick.  Who is on the

4     line?  Why don't we first go -- I'll hear from plaintiffs.

5              MR. NADLER:  Brett Nadler for plaintiff.

6              THE COURT:  For the defendants?

7              MS. TERSIGNI:  Good morning, your Honor.  This is

8     Andrea Tersigni for ABC defendants.

9              MR. BARRETT:  This is Stephen Barrett for Gilbar

10    Trading and Seymour Dayan.

11             THE COURT:  I'm in my courtroom.  We have a court

12    reporter here and my law clerk is here also.  So let me first

13    review for the parties the documents I have in connection with

14    today's conference.  I have the November 5th letter from

15    plaintiffs, plaintiff's letter from November 5 requesting a

16    conference.  I have the response of the ABC defendants on

17    November 6 and I have the November 10 letter from the ABC

18    defendants responding to my questions and providing income

19    statements as well as copy of the expert report of -- and I

20    apologize, how do you pronounce the expert's name?

21             MS. TERSIGNI:  Loketch.

22             THE COURT:  From Mr. Loketch.  So let me ask, first

23    I'll ask Mr. Nadler.  As I understand it, Mr. Loketch has been

24    proffered as an expert, an expert report has been produced.

25    Mr. Loketch is the accountant, as I understand it, for the ABC

FBOFMIN1

defendants and in connection with that work he prepared various

income statements which were prepared and actually produced a

while ago.  My understanding is defendant, the ABC defendants

have retained Mr. Loketch as an expert and that he's prepared

an expert report with regard to -- and this is just my, I have

not read the report cover to cover, but my cursory review would

be the specific profits or revenue, for lack of a better term

related to jeggings during the relevant time period.

        My understanding, though, is that the income

statements also, that there's backups which I think amount to

invoices, bills and the like that was utilized in some way to

create the income statements and possibly utilized in

connection with preparation of the expert report and that those

documents number some 40,000 pages or so.

        First let me ask, do I have all the submissions of the

parties?  First, Mr. Nadler?

        MR. NADLER:  With regard to the letters that you

referred to?

        THE COURT:  That's correct, Mr. Nadler.

        MR. NADLER:  Is that what you're asking, those are all

the submissions?

        THE COURT:  Correct.

        MR. NADLER:  Those are the three, I guess submissions,

yes, that were recently, of recent origin, I guess.

        THE COURT:  And Ms. Tersigni?

FBOFMIN1

1          MS. TERSIGNI:  Yes, I believe your Honor has

2     identified all of the applicable correspondence to the Court.

3          THE COURT:  Mr. Barrett, I think you're just an

4     observer in this.  I haven't received anything from you.

5          MR. BARRETT:  That's correct, your Honor.

6          THE COURT:  Okay.  So let me ask, as I understood it

7     from the letters, am I correct the expert deposition has not

8     occurred, the documents, the 40,000 pages of documents have not

9     been reviewed by plaintiff or otherwise produced?  Is that an

10    accurate statement of where things currently stand?

11         MR. NADLER:  That's correct, your Honor.

12         THE COURT:  All right.  So, as I understand, expert

13    discovery actually was scheduled to close on November 10.  So

14    let me hear from the parties and then I've got a possible

15    suggestion for the parties going forward.  First, Mr. Nadler.

16         MR. NADLER:  Well, your Honor, I think that one of the

17    preliminary issues is not so much whether it's expert

18    disclosure or expert -- whether these documents were underlying

19    the expert report, but more they were requested during

20    discovery and not produced and it was only after service of

21    this expert report and disclosure of this expert that the

22    existence of these documents were even disclosed, these 40,000

23    pages.  My understanding of the relevant rules is that the

24    documents certainly should have been turned over at an earlier

25    time in response to document requests that were served.  I

FBOFMIN1

1    specifically asked for these documents and, furthermore, they

2    were not objected to.  So as an initial issue, that's what is

3    of primary concern, that plaintiffs have a failure to disclose

4    these documents as well as Mr. Loketch, while being disclosed

5    as an expert now, and it turns out he prepared the income

6    statements that were turned over during discovery.  So

7    certainly it would appear that the ABC defendants had knowledge

8    of Mr. Loketch not as an expert but as a fact witness of sorts

9    or as someone who has relevant information as to the documents

10   that were turned over and could have been deposed during fact

11   discovery had his name been disclosed but wasn't.

12         It just seems that now that we're coming up on the eve

13   of trial all of a sudden there's 40,000 pages being disclosed,

14   names of witnesses who the ABC defendants appear to have known

15   or had actual knowledge of their relevant knowledge to this

16   case and yet were not disclosed.

17         THE COURT:  Okay.  Let me hear from the ABC defendants

18   counsel, Ms. Tersigni.

19         MS. TERSIGNI:  Yes, your Honor.  Thank you.  I'd like

20   to respond to plaintiff's position and also, if I'm permitted,

21   to make a proposal that I think might be viewed as positive not

22   only for the parties but for the Court as well.

23         With respect to the timeliness of the disclosure of

24   Mr. Loketch and the underlying documents, as your Honor

25   indicated, the income statements that are now attached to

FBOFMIN1

```
 1    Mr. Loketch's report as attachment 1 was produced to plaintiffs
 2    in the summer of 2014.  The idea that the existence of the
 3    underlying documents was allegedly not known and so the time
 4    when those same income statements were produced with the report
 5    is questionable because obviously the income statements are a
 6    summary based on underlying documents and Mr. Nadler never
 7    raised an issue regarding the underlying documents.  There's a
 8    reason there was no objection regarding the underlying
 9    documents, it's because ABC does not object to producing the
10    documents by way of making them available for inspection and
11    copying.  Further, it was very clear pursuant to the agreement
12    by way of discussions that the parties had at the inception of
13    the case that expert discovery, which typically will include
14    expert discovery regarding damages, would be left until after
15    any decision on dispositive motions to save time and expense in
16    the event it would be shown to not be necessary if the case was
17    summarily dismissed.  This was further supported by the fact
18    that indeed plaintiffs did not contact ABC to inquire about the
19    underlying documents and even if they had done so at the time
20    ABC would have certainly been open to discussing the
21    possibility of making them available for inspection and copying
22    at that time even though it would not have been required.
23          So on the issue of timeliness, ABC believes that it
24    has proceeded in accord with the Court's case management
25    scheduling order with respect to discovery of expert reports,
```

FBOFMIN1

1    expert witnesses, including underlying documents and that's

2    actually even specified in the case management order and there

3    are methods for allowing inspection and copying of these

4    documents without any prejudice to plaintiffs, a method that we

5    have attempted to discuss with plaintiff but have not had much

6    response in that regard.

7          Having said that, the proposal that ABC would like to

8    make that might lead to a positive resolution from the

9    perspective of everyone is that the issue of liability and

10    damages be bifurcated.  And this is also in accord with

11    decisions of Courts in this district and other districts as

12    well with respect to damages in entrenchment cases where

13    plaintiff demands an accounting of defendant's profits.  In

14    entrenchment cases it's not uncommon for Courts to leave

15    discovery with respect to damages and an accounting until after

16    the issue of liability is determined for the obvious reason

17    that to do so can avoid unnecessary expense.  And in this case,

18    this particular issue is a burden because we have the issue of

19    the cost of production.

20          So by bifurcating we can proceed, all parties can

21    proceed as presently scheduled.  ABC is prepared to proceed in

22    accord with the Court's current schedule with respect to

23    motions in limine, jury instructions, pretrial conference, the

24    trial itself and if there is a determination of liability --

25    and also there would need to be a determination of not only

FBOFMIN1

1    liability but intentional conduct as well, because we don't

2    need to reach the issue of damages for an accounting unless

3    intentional conduct is shown.  So all of these issues can be

4    explored at trial and if they're established then the Court can

5    review or establish another schedule for maybe further

6    discovery.  If plaintiffs would like to review these underlying

7    documents at that point, they can depose Mr. Loketch.  The

8    Court can also decide at that point what it would like to order

9    with respect to the costs, payment of costs for the production.

10        That's all, your Honor.

11        THE COURT:  Okay.  Is this something that you've

12   raised with your adversary or would this be the first time that

13   Mr. Nadler is hearing, this specific proposal.

14        MS. TERSIGNI:  I have not raised it with him.  I would

15   like to have felt that I could have, but under the present tone

16   of the litigation I don't think that that would have been

17   productive.  I have reached out, did reach out many times on

18   this issue and didn't get a response.  And I believe that that

19   would happen again.  It's a judgment call.  I hope that that

20   doesn't bar review of the proposal at this point.

21        THE COURT:  Let me ask this, Mr. Nadler:  Obviously

22   you just heard the proposal and I recognize that it is

23   something that you may need to consult with your client about,

24   but let me get your initial reactions to the proposal.

25        MR. NADLER:  I would say on the one hand this is

FBOFMIN1

purely -- as far as the damages that these document, the expert

goes to damages, bifurcation, I have to take up with the client

as well as give it additional thought whether that would solve

the problems or a portion of it.  But, again, we have no idea

what's in these 40,000 pages of documents that don't just go to

damages but also go to defendant's liability.  These are not --

if we were just framing these as documents that were being

identified in connection with an expert report, that would be

one thing, an expert report on damages.  But, again, these

documents were requested, specifically requested, all documents

related to any deductions or any documents concerning your

purchase of the subject goods, all of these were requested and

they weren't turned over and now there's this 40,000 pages and

at least I find the concern of what haven't we seen.  Sure, we

could just put it into a nice little package and say it all

goes to damages, but without having seen these documents or

even known of their existence prior to this time it would seem

a bit prejudicial to say, well, we don't really have to worry

about turning those documents over if we bifurcate and we

package them up as damage documents and go to trial on what

we've seen to date.

          THE COURT:  I have I suppose a slight variation on the

proposal or a separate proposal that I'd like the parties to

consider.  What I'd like the parties to do is to think about my

proposal and let me know where they stand and if you're not

FBOFMIN1

able to reach agreement I'll just decide on one or the other.
I think in connection with the -- well, let me ask this:  In
connection with the 40,000 pages of documents my thought on it
and my proposal was going to be that in advance of any actual
deposition of the expert that the plaintiff be permitted to
take a short deposition, whether it's termed a 30(b)(6) type
deposition or some other deposition, it may require
Mr. Loketch, it may require someone else, who would be able to
say sort of what those 40,000 documents are, how they were used
in connection with creating the income statements and how they
were used in connection with creating the expert report.  So
that would be the proposal that would deal with -- and then
after that deposition plaintiffs can make a decision about what
documents, what within those 40,000 documents they view as more
important than others and can make decisions about reviewing,
copying and the like.

         So that would be the overall proposal.  Then what
would follow would be the expert deposition.  But what I will
add, I guess, to address Mr. Nadler's concern with regard to
the bifurcation -- so this is my addendum to the bifurcation,
we would have a similar 30(b)(6) type deposition with regard to
these 40,000 pages of documents so that Mr. Nadler can make a
determination concerning whether those documents are documents
that, again, relate purely to damages or relate to both damages
and liability or relate solely to liability.  So it would be

FBOFMIN1

1    someone who is familiar with those documents who could provide

2    Mr. Nadler with an understanding of what those documents are so

3    that he can decide whether in terms of the fact discovery part

4    of the case, whether those documents are in fact things that he

5    believes some or all of them are relevant with regard to

6    liability.  And that would be the proposal that would be sort

7    of the add-on to Ms. Tersigni's proposal concerning

8    bifurcation.

9            So what I'd like the parties to do is to talk about

10   those two alternatives, and again, I have not been privy to any

11   other discussions but any other sort of resolutions, but I

12   think either of those two proposals I think deal with the issue

13   of the 40,000 pages.  I know it doesn't deal with the issue of

14   expense and who pays.  That I would leave for another day, but

15   it certainly deals with the issue of what relevance those

16   documents might have with regard to liability and what

17   relevance they might have with regard to damages.

18           All right.  First let me hear from Mr. Nadler with

19   regard to that.  I would like the parties to consider that.  I

20   know, obviously, that the Thanksgiving holiday is coming up,

21   but I'd like to get a response to the parties on this because

22   we do have a trial date in February and it's my intention to

23   keep that date.  Obviously, if we need to extend we are going

24   to need to extend, if the matter is not bifurcated, extend

25   expert discovery and obviously the 30(b)(6) suggestion I have

FBOFMIN1

with regard to the 40,000 documents would be an add-on to the

fact discovery.  To the extent that we would need to do that I

would permit that.

            So I would like to hear from the parties on this at

some point next week, but let me hear from Mr. Nadler with my

gloss on the bifurcation proposal as well as my independent

suggestion with regard to moving forward with the schedule,

including expert disclosure, but adding this aspect of the

deposition concerning the documents in advance.  Mr. Nadler?

            MR. NADLER:  Well, respectfully, your Honor, I guess,

I'm just trying to square how a failure to turn over documents,

had we made a motion to compel or a motion for preclusion, if

it was made in limine or whatnot, my understanding of Rule 37,

Rule 26, there would have been clear grounds for ordering some

sort of remedy to this, in which the defendants would have had

to offer substantial justification for not turning the

documents over.  The idea of taking a 30(b)(6) to ask someone

with knowledge what documents you believe are relevant to

damages, to liability, I guess asking a lay person what they

think is relevant is --

            THE COURT:  That determination would really be a

determination the lawyer would make based upon the facts as

they get from the witness.  In other words, I don't know what's

in these boxes of documents, but someone must.  So it would

really be, I think, Mr. Nadler, sort of your determination

FBOFMIN1

based upon what you know about the case, based upon the

relevant documents that have been produced as to whether the

documents would be relevant to liability or damages.  I

wasn't -- and I apologize if I was not clear -- I wasn't

suggesting that the person, the deponent, be given that view.

The deponent would be someone who could just explain what's in

these 40,000 pages of documents and obviously it would be to

the extent that the proposal would be to keep the schedule as

is, that person would also have to speak to, or that person

would have to speak to this also about how they were used to

create the income statements and how they were utilized in

connection with the expert report.

        Now, with regard to the Rule 37, no such motion was

made before me.  These are documents as I hear you say were

requested, but not produced, I don't know whether -- was there

a representation that they had been produced, in other words,

the documents, or was it just that they hadn't been produced

and neither side had really referenced them until really this

juncture?

        (Continued next page)

FBOAAMINC2                 Conference

1              MR. BARRETT:  Well, they were never disclosed nor

2       produced and if I understood Ms. Tersigni's statement earlier

3       she had indicated somehow that there was some sort of burden

4       somehow on plaintiffs to further demand documents that were

5       never identified.  For instance -- well, when the income

6       statement was produced Mr. Nadler -- I never asked for the

7       underlying documents.  However, those documents, the document

8       requests stated all documents concerning any number of

9       different topics that these documents would have been, fallen

10      under the umbrella of and they were not even identified.  They

11      were not disclosed.  So plaintiff had no knowledge of these

12      documents until the last two weeks ago when the letters were

13      written.

14              And again, to the extent that no motions have been

15      made yet that was I guess what was underlying my letter to the

16      Court to say perhaps there was a way before making such a

17      motion seeking the Court's guidance on how to resolve it.  But

18      I think the issue here is not so much tied to expert versus

19      nonexpert.  It was the non disclosure during fact discovery --

20      and this as been, and plaintiffs were held to a certain

21      standard earlier on in this case for doing something or

22      allegedly doing something that was in my opinion was far less

23      egregious than this that was -- disclosed existence of 40,000

24      pages of documents that were specifically requested.  And

25      again, there was no objection to it would be burdensome to

produce them, the costs.  And I know you said you'd leave the

costs for another day and we could do that so I'm not going to

get into, you know I won't waste the Court's time or opposing

counsel's time with going into arguments about that.  But I do

think that at a minimum, defendants should be required to

either turnover these documents at their own expense or -- I

mean Rule 37 is clear that preclusion is the remedy for

documents that are not produced or for failing to supplement

disclosures.  And then there's a number of factors the Court

can look at rather than preclusion as a lesser sanction but

that's only upon a showing of substantial justification for not

producing the documents I haven't heard any explanation from

defense counsel as to why these documents weren't produced when

they were specifically requested other than there was no

further requests for documents that were never disclosed.

THE COURT:  Well, let me ask this because again I

don't have the actual, as I understand it, I don't have the

actual requests in front of me.  Mr. Nadler, my suggestions

were in fact to deal with this issue to avoid a Rule 37 motion.

I don't know whether you're suggesting that you don't believe

that my resolution is what you're seeking, in other words that

you want to make that motion.

But let me hear from Ms. Tersigni concerning the issue

about the timeliness with regard to these 40,000 pages of

documents and whether they were requested and why they weren't

1    either made available either for copying, earlier for copying

2    or review or produced.

3         MS. TERSIGNI:  Well, as I indicated previously, your

4    Honor, ABC believes that these documents were timely produced

5    in accordance with the schedule set by the Court which was for

6    expert discovery to the be, as indicated.  These documents go

7    directly to damages which is what the expert is being called to

8    testify to.  These documents were obviously known to plaintiffs

9    at the time.  It's just not credible the notion that the income

10   statements were produced to them but they had no idea that

11   there were underlying documents.

12        And plaintiffs do indeed have a burden, your Honor,

13   with respect to trying to resolve discovery disputes.  I don't

14   think there will would be any dispute regarding that.  There's

15   no question that if a party believes that not enough discovery

16   has been made they pick up the phone and they call their

17   adversary and they say, hey, what about the underlying

18   documents?  I have these income statements but there must be

19   underlying documents, right?  That call was never made and

20   that's what I meant when I said the call was never.  And that

21   supports the reason that call was not made is because

22   plaintiffs understood that those underlying documents which

23   would have been for me to be voluminous because they usually

24   are and because we have nine scores at issue.  They assumed

25   that that would be left for expert discovery because the

FBOAAMINC2                    Conference

parties did not want to engage in the costs of dealing with

that discovery prior to a decision on the dispositive motions.

So number one, I have not heard either today nor did I

hear in my discussion with Mr. Nadler two weeks ago in trying

to resolve this although I asked him many, many times why is it

do you think that these are not timely in light of the -- and

schedule order that we have, indicating expert discovery about

the time that we've been discussing?  And I don't understand --

I don't think I heard a response or if there has been a

response to that I don't understand it.  I just keep hearing,

we requested it and we didn't get it.  And the response to that

is that we weren't required to produce it at the time.  They

did get documents anyway.  And the underlying documents were

obviously known.  Had there been an issue it could have been

resolved at the time and I don't think there would have been an

issue.  We would have made them available and it would be the

same thing then as it is now.  And to just keep insisting that

there's some issue with respect to timeliness especially in

light of the reference that Mr. Nadler has made to sanctions

that were imposed upon him, is there any issue regarding the

persistence about timeliness with that comment?  The comments

made I don't know how that's relevant to this issue.  I don't

believe that there is an issue regarding timeliness.  The Court

is offering options to deal with alleged prejudice.  ABC has

been offering options as requested.  All of the options are

FBOAAMINC2                Conference

from plaintiffs that they would like -- we have not received

any.  I've had to very affirmatively repeatedly invite

Mr. Nadler to inspect the documents, to schedule a time to come

review the documents and he wasn't interested.  He wants to

keep saying that it was untimely and so on and so forth.  And

it appeared that there's not an interest in resolving purported

prejudice.  And with respect to your Honor's suggestion, I

think it's important for us to keep in mind the circumstances

of this particular case.

        Now, while I think it makes sense that if there's some

question about what's contained in documents that pertains to

important issues like liability, yeah, it would make sense to

have an examination.  But number one in this case I have

represented, my firm has represented through pictures and in

writing to the Court what's in these documents.  There are bank

statements, similar records, utilities expenses, invoices and

paid bills which are normal documents with respect to documents

underlying income statements.

        Now, the notion that something about liability is

hidden in there needs more support to justify what we have in

this case.  We have estimated damages of less than, assuming

that plaintiffs could surmount its burden on -- liability and

that there was intentional backdated conduct here.  So assume

all of that -- and by the way plaintiff haves not even deemed

it necessary to depose ABC.  They never deposed ABC on any

FBOAAMINC2                    Conference

1    liability issues or on any intentional conduct issues.  They

2    only raised this purported issue now.  And if this is the case

3    was two thousand dollars the idea that we're going to have an

4    examination of potentially a representative of ABC or maybe it

5    would be the expert that's more costs.  Mr. Nadler will

6    undoubtedly seek to try to go beyond the scope of just

7    inquiring about these documents.

8              THE COURT:  Counsel?  Counsel?  Counsel?

9              MS. TERSIGNI:  -- and this is two thousand dollar

10   case.  It not -- the burden is not justified.  ABC believes

11   that the best way to deal with this issue and also properly

12   address plaintiff's concerns.  And the concerns should be for

13   plaintiff's alleged prejudice and how to resolve that.  Not

14   plaintiff's complaint that they were sanctioned and so for some

15   reason ABC should be sanctioned.  We can leave these issues

16   until after liability is determined.  We can then conduct if

17   it's deemed necessary and deemed that my representation of

18   what's in these documents are that there might be some reason

19   to think that there's anything in these records other than

20   invoices and payroll records, we can deal with that after

21   liability is determined and put this case back on track.

22             ABC wants to reach conclusion on this issue.  We want

23   to move forward and we want to comply with all the obligations

24   that we have, we believe that he have.  And we don't believe

25   that this is a good faith -- here.  But in the event that it

 1   is, it can be addressed after determination on liability.

 2               THE COURT:  OK.

 3               MR. NADLER:  Your Honor, if I may respond to that?

 4               THE COURT:  Yes.  Is that Mr. Nadler?

 5               MR. NADLER:  Yes.

 6               THE COURT:  Yes.  Go ahead.

 7               MR. NADLER:  The first thing is page three of the

 8   letter that I submitted on November 5 listed in the footnote

 9   some of the document requests that were served which your Honor

10   had indicated that you didn't have any of the specific document

11   requests in front of you, so the Court has that letter in front

12   of it.  The issue Ms. Tersigni makes a lot of presumptions and

13   uses word like "obviously" these documents were known or that

14   plaintiffs presumably -- we requested those documents, further

15   requests to be requested after specific and dispositive motion.

16   None of these presumptions or obvious things are actually

17   accurate.

18               Reality is documents were requested.  There's an

19   obligation to produce them.  If you fail to produce them

20   there's consequences and the rules lay that out very clearly.

21   It's not a matter of saying, well, because sanctions were

22   levied here that they should be levied again.  My point in

23   raising this was that when documents aren't timely produced

24   there's certain rules -- if any time there was a voluminous

25   amount of documents one could just bring them under an expert

FBOAAMINC2                    Conference

1    report and not turn them over during fact discovery.  Then you

2    know what is the -- is there in any of the rules in Rule 37 or

3    in 26 for that matter for disclosing the existence of documents

4    and responding to document requests.  The reality is that the

5    documents were requested.  They weren't produced.  They weren't

6    even made known in any disclosures or form.

7            THE COURT:  What was the -- I have the requests in

8    your Footnote One but what was in the response, the written

9    responses from ABC, what did they say?  In other words, what

10   did they say?

11           MR. NADLER:  For instance, number thirteen which was

12   all documents concerning gross profits or sales of ABC products

13   and this is the -- 000259 through 270.  So basically, these are

14   income, income statements.

15           THE COURT:  OK.  All right.  And I take it --

16           MR. NADLER:  At that point -- so at a minimum at that

17   point plaintiffs ABC had an obligation to, one, disclose

18   Mr. Lopez's identities because he was the person who created

19   the income statements.  So under Rule 26 timely supplemented

20   disclosures -- someone that was never done.  It was only for

21   because expert discovery happened to be held off until the end

22   and that was what was discussed at the beginning of the case

23   with the case management plan was setup.  But it worked out

24   conveniently that Mr. Lopez could then be disclosed -- but

25   putting that aside, the 40,000 pages are definitely responsive

FBOAAMINC2                 Conference

1    to that request or request number 25.  Again, there is the

2    response to that was see ABC 259 through 270.

3         If the document that underlies the income statement is

4    unquestionably responsive to that request.  And just because

5    there's 40,000 pages doesn't mean that you can just say, well,

6    we didn't have an obligation to produce them or, obviously,

7    plaintiffs knew about them and they didn't ask for them again.

8    I mean, there's a requirement when you respond to these things

9    that you are identifying and disclosing all the known

10   information and all the relevant information and documents that

11   are in possession, custody and control.

12        As to certain other representations or statements made

13   Ms. Tersigni that this being a two thousand dollar case that is

14   a damages issue, it's not -- plaintiff will disagree with the

15   defendant's calculation of damages but it's not to be decided

16   on today's call or isn't even necessarily relevant.  Reality is

17   the documents were requested.  They were -- and my

18   understanding again is that plaintiffs have the right to

19   request that the documents be produced in a certain form, that

20   the documents be produced in hard copy as they were.  And then

21   if the defendants object to that they can file an objection.

22   And if it's too burdensome to do that we can permit an

23   inspection or come up with some other way of dealing with this.

24   But when documents are requested in a certain form that was the

25   plaintiff's prerogative to request that we produce the hard

1   copy and that plaintiff should bear the cost of copying the

2   40,000 pages.  And on top of that the expense of these

3   documents shifts to plaintiffs to say, well, the only way that

4   can you really --

5           THE COURT:  Mr. Nadler, if you could slow down a

6   little bit.  And just from the point where you said we were

7   talking about the burden shouldn't be on the plaintiffs, if you

8   could just repeat that and just slow down.  The court reporter

9   is having a little bit of difficulty keeping up with you.

10          MR. NADLER:  My apologies.  The first point that I was

11  making was that the plaintiffs had requested the documents in

12  their document requests in a certain form, that the documents,

13  copies of the documents be produced to plaintiffs within 30

14  days of the request.  Common practice is to produce the

15  documents in the form that they were requested or in hard copy

16  form.  No objection was made by the ABC defendants to producing

17  the documents in that form or in any form.  They just

18  identified 11 pages of documents and just decided to disregard

19  the other 40,000.  Then on top of that, to the extent that

20  these documents were part of an expert report or underlying

21  expert report it would seem unreasonable to say that the only

22  way that plaintiffs could test the merits of that expert report

23  is if they were inclined to bear the burden of copying 40,000

24  pages of documents.  To the extent that this would allow

25  anybody who ever served an expert report to just say just based

FBOAAMINC2                    Conference

1    on hundreds of thousands of pages of documents and you,

2    recipient of that report, had the burden of copying those

3    documents if you want to attest to it.  My understanding, and

4    again are documents that experts relied on are usually produced

5    by the expert or by the parties producing the report with the

6    report itself.

7               But again, I don't want to move too far into the

8    expert area at this moment because I still think that the

9    primary issue, the primary underlying issue is why these

10   documents weren't produced during fact discovery.  And to

11   simply say, well, they weren't asked for two and three times

12   simply doesn't seem like a justifiable response.  It doesn't

13   seem like a reason that the documents were never even

14   disclosed.

15              THE COURT:  Well, I'm going to make a ruling with

16   regard to this.  With regard to the responses to -- and again,

17   I only have the one that you mentioned, Mr. Nadler.  I think

18   that defendants should have provided more information in their

19   responses.  However, I also think that the production of -- and

20   I don't know how many pages there are of the income statements

21   on themselves.  The income statements are clearly on their face

22   summaries and they had to have been based upon underlying

23   documents.  So what I'm saying is that I don't think either

24   side is completely, can absolve themselves of certain

25   responsibilities.  I understand the initial burden was on the

1   defendants but they produced documents which at least on their

2   face that I've seen clearly were summaries.  I'm not going to

3   order that they are precluded from utilizing these 40,000 pages

4   of documents.  I want the parties to consider my proposal.

5          I heard Ms. Tersigni indicating that it would be a

6   certain amount of costs.  But you know what?  I in an effort to

7   resolve this issue which could have been avoided but maybe not,

8   quite frankly, because I think because of the nature and the

9   way counsel has approached this case and I'm not describing it

10  to one side or the other, but it appears to me -- and this is

11  not the first time that counsel have had inability to really

12  discuss things and hear what we each other is saying in order

13  to come to sort of resolution or at least to focus the issues

14  for me.

15         So what I'm directing the parties to do is consider

16  the proposal both the Ms. Tersigni's proposal of bifurcation

17  but with the added part that again to address Mr. Nadler's --

18  again, and I don't know, I'm not privy to the parties'

19  discussions with regard to the contents of these documents.

20         Ms. Tersigni, I do recognize that you do indicate in

21  your letter and provide a photograph of some of the boxes in

22  question or maybe they're all the boxes.  I don't know.  But I

23  would permit again and it would be a short deposition as to

24  what these boxes actually contained.  And again, the deposition

25  can be avoided again, if the parties agree to the inspection.

1    But that my solution is that the deposition either occur to

2    satisfy Mr. Nadler that these are not documents that he

3    believes are relevant to the liability issue.  And then the

4    decision is whether or not the parties want to proceed and

5    either bifurcate or whether they want to proceed on both

6    tracks.  And if the parties aren't able to reach agreement I

7    will tell you what you are going to do.

8              But since --

9              MR. NADLER:  Your Honor?

10             THE COURT:  Yes, Mr. Nadler.

11             MR. NADLER:  If I might just make one last proposal

12   which is what I had proposed to Ms. Tersigni originally and we

13   would have perhaps avoided this entire thing?  When I

14   originally called Ms. Tersigni to, after I requested that she

15   produce, when she was producing all of the underlying documents

16   that the expert relied on and it was at that point that she

17   said, well, we will make that 40,000 pages, that 40,000 pages

18   we'll make them available for inspection, if Ms. Tersigni or he

19   the defendants produced the documents in some form I would

20   think that might be cheaper less expensive than necessarily

21   taking a deposition, asking someone what's in these boxes,

22   that's all we were really asking for.  We were willing to

23   perhaps -- not waive anything overlooked that the documents

24   were entitled to, they were produced now and then we had an

25   opportunity to actually review testimony and see what they

1  contained and perhaps that would raise issues.  But we have no

2  idea what's in those documents.

3          And if the Court believes taking a deposition to have

4  somebody answer to what's in those books then that is perhaps

5  the best way, we will follow the Court's lead on that.  But to

6  the extent that there's these other issues, the intent was not

7  to put this on two tracks or to have bifurcation or to have

8  multiple depositions.  Really it came out of no where that

9  these documents even existed.

10          THE COURT:  Well, I mean --

11          MS. TERSIGNI:  Your Honor?

12          THE COURT:  Just one moment, please, Ms. Tersigni.

13          MS. TERSIGNI:  Yes.  I am sorry.

14          THE COURT:  That's OK.  Mr. Nadler, while I agree with

15  you that the affirmative disclosure of the documents was

16  something that had not occurred, I don't agree with you that

17  had someone looked at the income statements that you could view

18  it as anything other unless and, again, I don't know what other

19  documents have been produced but that someone could review the

20  income statements as anything other than a summary that has to

21  be based upon some underlying documents.

22          Now, all I'm doing is just pointing out that while I

23  agree with you the actual disclosure, oh, by the way there are

24  40,000 documents did not occur until later.  I have no idea

25  what's more expensive or not.  I've told the parties what I

1   would like to have happen.  If it's less expensive to produce

2   the documents, fine.

3            MS. TERSIGNI:  It's not.

4            THE COURT:  All right.  Mr. Nadler, I guess is it your

5   request that -- because it's not going to be both.  So, you're

6   either going to get the documents produced to you.  You're not

7   going to have a deposition to find out sort of what they are

8   and what they consist of and you are not going to be able to

9   find out how they were utilized in connection with the income

10  statement.  You'll just get the documents and you'll be on your

11  own to figure that out.  And when it comes time for the expert

12  deposition you can ask your questions within the bounds of the

13  length of the expert deposition.

14           So I guess what I'm saying is I'm leaving it up to the

15  parties.  I'm not going to -- If, Mr. Nadler, what you're

16  saying is you don't want to have the deposition and that

17  because whether it's expensive because of a choice, then that's

18  a fine.  But I don't know what the cost of producing the

19  documents are because I imagine all of them are not necessarily

20  uniform.

21           MS. TERSIGNI:  Can I provide some invite on that?

22           THE COURT:  Sure.

23           MS. TERSIGNI:  We have approximately 40,000 pages.

24  And our copying service will copy documents at a base of

25  fifteen cents per page but that can vary.  But assuming it's

FBOAAMINC2                Conference

the base now, that's six thousand dollars for what we believe

is a two thousand dollars case.

        Also, why can't plaintiff come and inspect the

documents to see what's in them?  They are well organized and

labeled.  I sent you the pictures.  So when they open up the

box of invoices it's going to be lots of invoices.  I'm having

trouble imagining what regarding liability would be in there.

There are no issues remaining to be in dispute regarding the

amount, the number of units sold and what they were sold for.

But I can't imagine what would be in there.  But they can, I

would think -- I haven't done it myself -- but I would think if

this were my tax, I would go have a look at -- it's eight

boxes.  It's not a warehouse.  They're very labeled and I would

at the very least try to see if I can make sense of it

relatively quickly.  Presumably, plaintiffs will have to do

some kind of review at some point even if 40,000 pages are

reproduced, they will have to look through them.  Why not go.

Maybe they only need one or two boxes.  Maybe they just want

certain documents.  They don't need the invoices.  The invoices

show all of the sales which is not -- and then we deduct from

that to get our net profit.  But I don't understand what the

issue is.  But to the extent that they believe that there might

be some question as to what's in these documents, I believe

they could perform a reasonable review of these documents in

the matter of hours.  If counsel just simply looks at it and

1    determines, do I really need these?  And if he makes that

2    determination we can go from there.  But here, we're shooting

3    in the dark saying that we are going to have a deposition and

4    we're going to decide which documents go to liability he's

5    going to question about 40,000 documents.  And the response he

6    will likely get is, these are the categories of documents.

7    These are the documents we use to prepare our income

8    statements.

9         And I don't know where counsel goes from there.  I'm

10   not saying we have to determine that now but I'm trying to

11   balance the circumstances of this particular case with the

12   purported issues and the possible expense that can be involved

13   based on these purported issues.  And we can address this in a

14   more narrow way if plaintiffs would at least attempt to see

15   what it is that they might want to look at.  Go look at it and

16   let's go from there.  This is what I was focusing on during the

17   discovery conference.  Let's get down to what it is you need

18   and what it is you feel you need to prepare for trial.

19        And on that note we were trying to say, do you need

20   more time?  What's the issue?  What would you like?  And he

21   would not give me any time frame that he wanted.  So I offered

22   a timeframe and he didn't say that wouldn't work and so on and

23   so forth.  So a lot of this is questionable.  The motives here

24   are questionable.  But putting aside because there is

25   speculation, I don't know.  I think we really need to keep an

1    eye on the expense and the burden versus the circumstances of

2    this particular case.  There should not be undue and oppressive

3    expense and burden because this supposed issue has been raised

4    and I think we need to consider where this issue is coming from

5    and whether it's a real issue and can be resolved with less

6    expense.

7                THE COURT:  Mr. Nadler --

8                MR. NADLER:  The time for raising that objection was

9    in the document response and it wasn't me.

10               THE COURT:  Mr. Nadler, let me ask this though.  You

11   say you want all of the documents.  Why not spend half an hour,

12   40 minutes looking at them to determine whether you want them

13   all?  If what you are saying to me is that you want them all so

14   you can review them, then I'll hear you on that.  But I'm just

15   trying to figure out what the alternative is that you're

16   actually seeking.

17               MR. NADLER:  I'm not sure I understand.  I could look

18   at 40,000 pages of documents and say that these are all

19   document that were relied upon in making the income statement.

20   One of the issues is that the connection with the income

21   statement or any of the categories has to the subject to the

22   accused -- in this case, there has to be a nexus between them.

23   In order for me to even assess whether there's a connection

24   between I'd have to look at each of the documents and see,

25   don't they reference the accused apparel or not?  And that

FBOAAMINC2                    Conference

1   presumably would require looking at each of the documents

2   unless the defendants are to be deposed on -- I thought that

3   was actually going to have to go into the expert witness

4   deposition and explain to me how this category whatever it is

5   in that income statement is connected to the accused apparel

6   and then show me where in the documents is that connection

7   made.  To go and look at 40,000 pages of documents and say,

8   okay, OK we have a box of invoices, we have box of paystubs, we

9   have a box -- I can do that but I could also, I don't know

10  where that will leave us because if --

11          THE COURT:  Well, at a minimum it would leave us as I

12  understood you earlier to say is that you didn't know one way

13  or the other whether the documents that are part of these

14  40,000 were related to liability or damages.  It would allow

15  you to assess whether or not there are any in there that you

16  believe relate to liability.  At least I think it would be.  In

17  other words, that you wouldn't necessarily have to rely on as I

18  understand it the representation counsel has made as to what

19  the documents are.  You could actually see them for yourself.

20  My question is, with regard to reviewing them I take it you are

21  saying you don't think it would be a useful exercise to do

22  that.

23          MR. NADLER:  In the 30 to 40 minutes I could get an

24  understanding of what the roots of the documents are but it's

25  40,000 pages. it's a monumental amount of documents for review

FBOAAMINC2                    Conference

1    and if there's something in those documents that -- again, when

2    I say that I don't know whether one way or the other whether

3    they go to liability or damages it's not meant to say that -- I

4    have no idea what's in those documents, not just the categories

5    but what any individual document could show.

6          THE COURT:  OK.  So I guess my question is I had made

7    various suggestions.  Ms. Tersigni had made suggestions but it

8    sounds like, Mr. Nadler, you just want to get all the

9    documents.

10         MR. NADLER:  Your Honor, out of respect for you and

11   for -- I will take the proposal that in consideration and think

12   about it further and see if we can work -- you know because --

13         THE COURT:  Why don't you do that.  Why don't you do

14   that.  And what I'd like to do is hear back from the parties in

15   a week from today which is -- so on December 1st to hear

16   whether or not there's been some sort of resolution.  And if

17   not, I'll just issue an order directing what the parties should

18   do.

19         MR. NADLER:  Your Honor, just one other question.  We

20   have motions in limine and pretrial memorandum currently due on

21   December 7th, I believe.

22         THE COURT:  Once I make a decision if I need to make a

23   decision on December 1st.  Well, I will reset the schedule for

24   that.  To the extent, again, I don't know what these -- so,

25   it's motions in limine due on the 7th.

1          And I guess, Mr. Nadler, you are saying you don't know

2    whether these documents go toward, impact that.  But I'll hold

3    that date

4          MR. NADLER:  -- we were to make a motion in limine for

5    some sort of --

6          THE COURT:  I'll hold that date in abeyance and I'm

7    going to move that date.  I don't know what that date will

8    become.  But I'm not saying that the parties, if they have

9    certain motions in limine that don't relate to these issues or

10   these documents they, obviously, can work on them but December

11   7, that date will be moved depending upon whether the parties

12   are able to agree and I'll reset the schedule next week once I

13   get the parties', the information from the parties, in other

14   words, whether there is an agreement or not.

15         MS. TERSIGNI:  Your Honor, can I just clarify what the

16   game plan is?  So the parties are to wait for Mr. Nadler to

17   consider the proposal of the Court and ABC and then the parties

18   are if there's any movement to be made in this regard

19   Mr. Nadler will contact us?

20         THE COURT:  Well, I think the parties should actually

21   once Mr. Nadler sort of reviews the proposal -- and again, they

22   should then meet and confer.  And if Mr. Nadler says, no, I

23   want -- I've looked at all the proposals.  None of them work

24   for me.  I've discussed bifurcation with my client and that

25   doesn't work either, you know what I would like to have happen

1    is have these documents produced or whatever the outcome is.

2    But once he's had an opportunity to think about it, consult

3    with his client, the parties should then meet and confer and

4    come to -- Well, if there isn't an ability to come to an

5    agreement, just let me know, we have been unable to reach an

6    agreement and I'll issue an order directing you to do --

7    directing what the parties should to.

8             If you're able to speak with one another and reach an

9    agreement -- and it's not limited to what we've discussed here

10   today.  Obviously, if somebody comes up with another idea that

11   they think would work and be efficient for the parties, you are

12   absolutely welcome to do that.  The only reason why I'm sort of

13   put out the different scenarios is that at least in the past

14   left to your own devices you haven't been able to really do

15   that effectively but if you are able to do that, that's fine

16   also.  But what I'm saying is after Mr. Nadler, cause I

17   understand this is the first time he heard about the

18   bifurcation and the first time he had heard about my

19   suggestion.  And after he has time to think about it he should

20   contact Ms. Tersigni and have a conversation.  It may be a

21   short conversation and then the parties should write a joint

22   letter saying whether they were able to reach a resolution or

23   not, or if there is anything of more specificity the parties

24   believe that would be useful, in other words, concerning a

25   particular proposal but there may be one issue that the parties

FBOAAMINC2                    Conference

1    have been unable to resolve.

2            And if you are unable to reach a conclusion I will

3    issue an order directing the parties what the parties should do

4    as well as resetting the schedule.  But I would reset the

5    schedule again if it's not going to be bifurcated, I'll reset

6    schedule in such a way no matter what that we're going to keep

7    that February trial date.  All right?

8            MR. NADLER:  Your Honor, we have until December 2nd --

9    that's a Wednesday -- just because of Thanksgiving holiday we

10   are going to lose a couple days and I would just ask for one

11   additional day to report to the Court with the --

12           THE COURT:  That's fine.  December 2nd is fine.

13           MR. NADLER:  Okay.  Thank you.

14           THE COURT:  Look, I understand it is the holidays.  So

15   if it comes down to it and for whatever reason you need one

16   extra day, that's fine.  But right now I'm expecting to hear

17   from the parties on December 2nd.

18           MS. TERSIGNI:  Thank you, your Honor.

19           MR. NADLER:  Thank you.

20           THE COURT:  Thank you.  Look forward to getting your

21   letter.  Take care, everyone.  Have a good Thanksgiving.

22                          (Adjourned)

23

24

25